Filed 12/26/13

# IN THE SUPREME COURT OF CALIFORNIA

ANNEMARIE DONKIN et al., )
)
　　　Plaintiffs and Respondents, )
) S202210
　　　v. )
) Ct.App. 2/1 B228704
RODNEY E. DONKIN, JR., et al., as )
Trustees, etc., )
) Los Angeles County
　　　Defendants and Appellants. ) Super. Ct. No. BP109463
_____ )

　　　Rodney E. Donkin and Mary E. Donkin, a married couple, executed a revocable trust in 1988 (the Family Trust) as part of their estate planning, naming their four children as equal primary beneficiaries after they both had died.[1] Rodney died in 2002. Shortly before her death in 2005, Mary executed a second amendment to the Family Trust instrument (hereafter the Trust's Second

---

[1]　　　When we subsequently refer to the Donkins, we mean both Mary E. Donkin and Rodney E. Donkin. When we refer to one of them individually, we will use only the first name for clarity and convenience. After one of the Donkins' four children, Craig K. M. Donkin, predeceased the Donkins, the Donkins executed a first amendment to the Family Trust instrument to name their remaining three children, Rodney E. Donkin, Jr., Annemarie Donkin, and Lisa Donkin Kim as the primary beneficiaries. We will sometimes refer to these Donkin children by their first names, again for clarity and convenience. The Donkins' first amendment to the Family Trust instrument also changed the first-named successor trustees from all four of the Donkins' children to Rodney Jr. and his wife, Vicki Donkin (hereafter the successor trustees).

1

Amendment) altering the provisions governing the allocation of the Family Trust's assets after her death. Both the Trust's Second Amendment and the original Family Trust instrument contain a "no contest" clause. In 2009, Annemarie and Lisa (hereafter the beneficiaries) filed a "safe harbor" proceeding in the probate court seeking a determination that the petition they proposed to file, challenging the conduct of the successor trustees under the asserted authority of the Trust's Second Amendment, would not trigger the no contest clauses of the amended Family Trust instrument.

We consider in this case whether the no contest clause law that became operative on January 1, 2010, while the beneficiaries' safe harbor application was still pending (Prob. Code, § 21310 et seq.; hereafter the current law) or the no contest clause law operative at the time of the filing of their safe harbor application (Prob. Code, former § 21300 et seq., repealed by Stats. 2008, ch. 174, § 1, p. 567; hereafter the former law) applies to the beneficiaries' proposed petition and whether under the applicable law the beneficiaries may pursue their proposed claims without risk of being disinherited.[2]

We conclude that safe harbor proceedings filed before 2010 are not affected by the repeal of former section 21320, which previously authorized safe harbor applications, and therefore, the probate court did not err in ruling on the beneficiaries' application. As to the substantive question of whether the beneficiaries' proposed claims trigger the no contest clauses, we conclude that the current law is applicable because the amended Family Trust instrument became irrevocable after January 1, 2001. (§ 21315, subd. (a).) We further conclude that

---

[2] All further statutory references are to the Probate Code unless otherwise indicated.

2

under the current law, the no contest clauses in the amended Family Trust instrument are unenforceable against the beneficiaries' proposed petition. We recognize that a party may be able to qualify for a fairness exception (§ 3, subd. (h)) to the presumptive applicability of the current law to instruments that became irrevocable after January 1, 2001, if application of the former law would compel a different conclusion as to enforceability of a no contest clause and it is established that the trustor(s) of the trust instrument drafted the no contest clause in reliance on the former law. Here, however, the successor trustees are not able to claim such a fairness exception, because application of the former law would yield the same conclusion regarding the unenforceability of the no contest clauses. We reverse the judgment of the Court of Appeal, which determined that certain of the beneficiaries' claims constituted a contest violating the no contest clauses of the amended Family Trust instrument under the former law.

## I. THE DONKINS' ESTATE PLAN

Federal law allows the property of a deceased spouse to be passed to the surviving spouse without payment of federal estate tax through the allowance of a "marital deduction." (Int.Rev. Code, § 2056.) The value of the estate of the surviving spouse is increased by such a passage of assets and it may be enlarged to the point where it will exceed the federal unified tax credit allowable to the estate when the surviving spouse dies. (*Id.*, § 2010; see 2 Drafting Cal. Revocable Trusts (Cont.Ed.Bar 4th ed. 2003) Bypass and Disclaimer Trusts, § 14.1, pp. 14-2 to 14-3 (rev. 9/13).) A common method of addressing such a situation, having the purpose of minimizing the estate taxes owed, is to provide for the transfer to the surviving spouse of only as much of the deceased spouse's property as necessary to reduce the deceased spouse's estate tax to zero with use of the applicable federal estate tax exemption. The property remaining in the deceased spouse's estate is placed in a bypass trust, which makes those assets available for the surviving spouse's use

3

but does not give the surviving spouse rights to the property in the bypass trust that would cause any of the undistributed trust property to be included in the taxable estate of the surviving spouse upon his or her death. (Int.Rev. Code, § 2041; 1 Drafting Cal. Revocable Trusts, *supra*, Marital Deduction Formulas and Funding, § 11.1B, pp. 11-4 to 11-5 (rev. 9/13); 2 Drafting Cal. Revocable Trusts, *supra*, Bypass and Disclaimer Trusts, § 14.1, at pp. 14-2 to 14-3 (rev. 9/13).) Thus, "the undistributed assets of the decedent's estate . . . 'bypass' the survivor's estate." (2 Drafting Cal. Revocable Trusts, *supra*, Bypass and Disclaimer Trusts, § 14.1, at pp. 14-2 to 14-3 (rev. 9/13).) "To avoid federal estate tax inclusion in the surviving spouse's estate, the bypass trust must be irrevocable and *unamendable* on and after the first spouse's death." (2 Drafting Cal. Revocable Trusts, *supra*, Revocation and Amendment, § 20.6, p. 20-14 (rev. 9/13), italics added.)

In August 1988, the Donkins executed the original Family Trust instrument, along with their individual wills. The Family Trust was formed to hold title to the couple's real and personal property for their benefit during their lives and ultimately after their deaths to provide for the transfer of their assets to their beneficiaries. The Family Trust was a revocable "grantor" trust (Int.Rev. Code, § 676) for as long as the Donkins were both living.

On the death of the first spouse, the Family Trust instrument requires the trustee to divide the trust estate into two shares — a survivor's share that is designated "Survivor's Trust A" and a decedent's share that is designated "Decedent's Marital Share." Survivor's Trust A consists of the surviving spouse's separate property and his or her one-half interest in the community property. It remains revocable during the life of the surviving spouse, and becomes irrevocable upon the surviving spouse's death. Decedent's Marital Share consists of the decedent spouse's separate property and his or her interest in the community

4

property. It is to be divided into two shares: Decedent's Trust B and Decedent's Trust C. The Family Trust instrument states that upon creation these subtrusts "are irrevocable." The Family Trust instrument specifies that Decedent's Trust B is to contain property with a value equal to the largest amount possible that will not result in a federal estate tax being imposed on the estate of the deceased spouse. (Int.Rev. Code, § 2010.) Decedent's Trust C is a marital deduction trust, which is to contain essentially the residue of the deceased spouse's estate not allocated to Decedent's Trust B. (See, generally, *id.*, § 2056.)

The Family Trust instrument provides that the surviving spouse is entitled to all of the income of the Survivor's Trust A, and as much principal as requested. The surviving spouse retains the right to change the beneficiaries of the Survivor's Trust A. In addition, the surviving spouse is entitled to all of the income of the Decedent's Trusts B and C, and as much of the principal of either trust as the trustee deems necessary for the surviving spouse's medical care, education and comfortable maintenance. The surviving spouse has a noncumulative power to withdraw $5,000 or 5 percent of the aggregate value of the principal of the Decedent's Trusts B and C annually, and a testamentary power of appointment over the assets of Decedent's Trust C, the marital deduction trust. Consistent with the requirements of a bypass trust, nothing in the Family Trust instrument authorizes the surviving spouse to revoke or amend the provisions of Decedent's Trust B.[3]

Upon the death of the surviving spouse, the Family Trust instrument, originally and as amended by the Donkins in 2002, provides for the payment of

---

[3] Indeed, the Family Trust instrument and the Donkins' wills, as executed in 1988, make a number of references to federal estate tax provisions, demonstrating the Donkins' clear intent to establish an estate plan that minimizes estate taxes.

the debts and obligations of the trust estate and the distribution of any special bequests. It contains provisions governing "support and education" needs, "extraordinary distribution," and "handicapped beneficiaries." As relevant here, it then directs the trustee to allocate and divide the remaining assets of all three trusts into separate shares so as to provide one share for each of the surviving designated primary beneficiaries and one share for each deceased primary beneficiary leaving surviving issue. After allocating and dividing the residual of the trust estate into shares, the trustee is directed to distribute the allocated shares "outright as soon as is practicable."

In 2005, after the death of Rodney and shortly before her death, Mary executed the Trust's Second Amendment. The Trust's Second Amendment substituted a new paragraph regarding the allocation of the trust assets after her death as the surviving spouse. Instead of directing an immediate allocation and division of the assets into separate shares for the beneficiaries, the new paragraph grants the successor trustees "complete discretion" after the death of Mary to retain the assets of the Family Trust intact and to continue to manage the property for the equal benefit of the primary beneficiaries. The new paragraph also grants the successor trustees discretion to liquidate assets, and if they choose to do so, directs them to allocate and divide the liquidated assets into separate trust shares for the beneficiaries. The new paragraph provides that the successor trustees, in their sole discretion, may continue to manage and invest such liquidated assets. The new paragraph grants the successor trustees sole discretion over distribution of income and principal from the trust shares to the beneficiaries. The Trust's Second Amendment otherwise confirms and republishes the remainder of the provisions of the trust, including the paragraph in the Family Trust instrument that required the trustee, "after allocating and dividing the residual of the Trust Estate

6

into shares," to "distribute the shares allocated to Primary Beneficiaries outright as soon as is practicable."

The Family Trust instrument, as confirmed and republished, contains a no contest clause. The Trust's Second Amendment added a further no contest clause.

The first no contest clause in the Family Trust instrument states as follows: "The Settlors [the Donkins] desire that this Trust, the Trust Estate and the Trust Administrators and beneficiaries shall not be involved in time consuming and costly litigation concerning the function of this Trust and disbursement of the assets. Furthermore, the Settlors have taken great care to designate, through the provisions of this Trust, how they want the Trust Estate distributed. Therefore, if a beneficiary, or a representative of a beneficiary, or one claiming a beneficial interest in the Trust Estate, should legally challenge this Trust, its provisions, or asset distributions, then all asset distributions to said challenging beneficiary shall be retained in Trust and distributed to the remaining beneficiaries herein named, as if said challenging beneficiary and his or her issue had predeceased the distribution of the Trust Estate."

The no contest clause added by the Trust's Second Amendment provides: "If any beneficiary in any manner, directly or indirectly, contests or attacks this instrument or any of its provisions, any share or interest in the trust given to that contesting beneficiary under this instrument is revoked and shall be disposed of in the same manner provided herein as if that contesting beneficiary had predeceased the settlor."

## II. PROCEEDINGS IN THE PROBATE COURT AND COURT OF APPEAL

In 2008, the beneficiaries filed an application in the probate court under the safe harbor provision of former section 21320 to determine whether the petition

7

they proposed to file would trigger the no contest clause in either the Family Trust instrument or the Trust's Second Amendment.[4]  Their petition would seek to compel a proper accounting from the successor trustees, to fix the compensation of the successor trustees and surcharge them for any excess fees, to remove the successor trustees from office for misfeasance, and to compel the distribution of the assets of Decedent's Trusts B and C on the ground that the Family Trust instrument required such assets to be distributed upon the death of Mary in 2005. After a dispute arose over whether the beneficiaries were required to arbitrate their claims pursuant to an arbitration clause in the Family Trust instrument, the beneficiaries withdrew their safe harbor application.

In 2009, the beneficiaries renewed their safe harbor application, alleging that their proposed action was not a contest within the meaning of either of the no contest clauses contained in the amended Family Trust instrument.  They included a request that the court, upon determining their claims do not constitute a violation of the no contest provisions, order that the disputes be submitted to arbitration. The probate court denied without prejudice the request for an order submitting the matter to arbitration, leaving pending the beneficiaries' safe harbor application.

---

[4]     Former section 21320, subdivision (a), provided:  "If an instrument containing a no contest clause is or has become irrevocable, a beneficiary may apply to the court for a determination of whether a particular motion, petition, or other act by the beneficiary . . . would be a contest within the terms of the no contest clause."  (As amended by Stats. 2002, ch. 150, § 3, p. 758, repealed by Stats. 2008, ch. 174, § 1, p. 567, eff. Jan. 1, 2009, operative Jan. 1, 2010.)  Former "[s]ection 21320 has been referred to as a 'safe harbor' provision," meaning that a beneficiary may "obtain a ruling on the applicability of no contest clause issues without running the risk of disinheritance."  (*Estate of Ferber* (1998) 66 Cal.App.4th 244, 248, fn. 4.)

In early 2010, the successor trustees filed their response to the safe harbor application, noting that the former provisions of the Probate Code governing no contest clauses had been repealed and replaced with a new statutory scheme, operative January 1, 2010.  Because the new statutory scheme eliminated the safe harbor process, the successor trustees argued that the beneficiaries' safe harbor application was subject to demurrer.  Nevertheless, the successor trustees requested that the court apply the former safe harbor provisions, pursuant to section 3, subdivision (h),[5] because the beneficiaries' pleadings had been filed under the former law.  Under the former law, the successor trustees argued, the court should determine that the beneficiaries' proposed claims violate the no contest clauses.  The beneficiaries responded, reiterating their request that the court find their proposed petition did not constitute a contest.

The probate court authorized the successor trustees to file a petition for instructions further explaining their position regarding the applicability of the new law to the beneficiaries' safe harbor application.  The successor trustees filed a petition arguing that the court should apply the former law and determine that the claims raised by the beneficiaries in their safe harbor application and proposed petition would violate the trust's no contest clauses.  The successor trustees also

---

**5**      Section 3 provides general transitional provisions for the applicability of the Probate Code and any changes to the code.  (§ 3, subd. (b).)  Subdivision (h) of section 3 provides an exception to the general rules that are otherwise stated in the section.  Subdivision (h) states:  "If a party shows, and the court determines, that application of a particular provision of the new law or of the old law in the manner required by this section or by the new law would substantially interfere with the effective conduct of the proceedings or the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date, the court may, notwithstanding this section or the new law, apply either the new law or the old law to the extent reasonably necessary to mitigate the substantial interference."

argued that the beneficiaries' petition to compel arbitration of their claims itself violated the no contest clauses. At the same time, the successor trustees contended that the Family Trust instrument obligated the beneficiaries to arbitrate any disputes that could be legally raised, and that by filing the safe harbor application instead of arbitrating, the beneficiaries had triggered the no contest clauses. The successor trustees contended that once the no contest clauses were triggered, the beneficiaries were no longer beneficiaries and had no standing to contest the trustees' actions, and their safe harbor application should be dismissed with prejudice. The beneficiaries replied that their actions were consistent with the provisions of the amended Family Trust instrument and that the court had discretion to apply the former law and rule that the claims identified in their safe harbor application did not violate the no contest clauses.

After a hearing on the matter, the probate court concluded, without making a specific finding whether the former or the current no contest clause law applied, that the matters raised in the beneficiaries' proposed petition did not constitute a contest under the terms of the no contest clauses of the subject trust.

The successor trustees appealed, arguing, among other things, that the language used in the Trust's Second Amendment reflected a clear intent by Mary to change the distribution plan for all of the assets owned by the trust at the time of her death, including the assets in the Decedent's Marital Share trusts, by giving the successor trustees broad discretionary power over the disposition of the entire trust estate. The successor trustees contended, therefore, that the beneficiaries' demand for a distribution of the assets in the decedent's trusts on the ground that such trusts were irrevocable and unaffected by the Trust's Second Amendment constituted a challenge to and an attack on the validity of the Trust's Second Amendment, triggering the no contest clauses. In addition to opposing these

claims, the beneficiaries argued that the successor trustees lacked standing to appeal.

The Court of Appeal affirmed in part and reversed in part. It concluded that both the beneficiaries and the successor trustees had standing and affirmed the probate court's order to the extent it impliedly determined that the former no contest law applied. The Court of Appeal otherwise reversed the judgment, concluding that "as a matter of law, the beneficiaries' challenges to Mary's ability to amend the Trust with the [Trust's] Second Amendment, the Trustees' failure to make distributions, and Mary's failure to create the subtrusts required by the Trust would, if pursued, constitute a contest under the no contest clause because these challenges attack the distributive scheme of the Trust by requiring the Trustees to exercise their discretion when they are not required to do so by the [Trust's] Second Amendment. The beneficiaries' contention that the [Trust's] Second Amendment does not apply to the Trust because the surviving settlor (Mary) lacked . . . the power to amend the Trust also constitutes a challenge to the distributive scheme of the Settlors."

We granted the beneficiaries' petition for review.

### III. BACKGROUND REGARDING THE ENFORCEABILITY OF NO CONTEST CLAUSES

Before we consider the issues on which we granted review, we find it helpful to review generally the development of California law regarding no contest clauses.

An in terrorem or no contest clause in a trust instrument "essentially acts as a disinheritance device, i.e., if a beneficiary contests or seeks to impair or invalidate the trust instrument or its provisions, the beneficiary will be disinherited and thus may not take the gift or devise provided under the instrument." (*Burch v. George* (1994) 7 Cal.4th 246, 265 (*Burch*).) No contest clauses, whether in wills

11

or trusts, have long been held valid in California. (*Id.*, at p. 254; *In re Estate of Kitchen* (1923) 192 Cal. 384, 389; *In re Estate of Hite* (1909) 155 Cal. 436, 439-441.) Such clauses promote the public policies of honoring the intent of the donor and discouraging litigation by persons whose expectations are frustrated by the donative scheme of the instrument. (*Burch, supra,* at p. 254.)

In tension with these public policy interests are the policy interests of avoiding forfeitures and promoting full access of the courts to all relevant information concerning the validity and effect of a will, trust, or other instrument. (See Selvin, *Comment: Terror in Probate* (1964) 16 Stan. L.Rev. 355, 366-368.) In light of these opposing interests, the common law in California recognized the enforceability of no contest clauses, albeit strictly construed, "so long as the condition was not prohibited by some law or opposed to public policy." (*In re Estate of Kitchen, supra,* 192 Cal. at p. 388.)

In1989, the California Law Revision Commission (the Commission) studied the policies involved in enforcement of no contest clauses and concluded the balance between the conflicting policies established by existing California case law was "basically sound." (Recommendation Relating to No Contest Clauses (Jan. 1989) 20 Cal. Law Revision Com. Rep. (1990) pp. 11-12.) The Commission recommended the partial codification of California's common law rules regarding the enforcement of no contest clauses with the addition of a number of changes thought to improve the existing law. (*Id.*, at pp. 12-14.)

Acting on such recommendations, the Legislature enacted in 1989 a series of statutes governing no contest clauses, which continued to generally recognize no contest clauses as enforceable, but incorporated several express limitations based on principles of existing law. (Former §§ 21303, 21306 & 21307; Stats. 1989, ch. 544, § 19, pp. 1825-1826; see *Estate of Bergland* (1919) 180 Cal. 629, 636-637; *Estate of Lewy* (1974) 39 Cal.App.3d 729, 734; former § 6112, subd. (d),

Stats. 1988, ch. 1199, § 75, pp. 3919-3920.)  The adopted statutory limitations were, however, "not intended as a complete listing of acts that may be held exempt from enforcement of a no contest clause."  (Recommendation Relating to No Contest Clauses, *supra*, 20 Cal. Law Revision Com. Rep. (1990) p. 19; see Cal. Law Revision Com. com., reprinted at 54A West's Ann. Prob. Code (1991 ed.) foll. former §§ 21306, 21307, pp. 314-315, 316.)  The statutes were intended as only a partial codification of the common law.  (Former § 21301, Stats. 1989, ch. 544, § 19, p. 1825.)[6]

Over the next decade, the Legislature continued to amend the statutes regarding the enforcement of no contest clauses, specifically identifying various types of claims for which a safe harbor proceeding was expressly available and further identifying specific types of actions against which a no contest clause was not enforceable as a matter of public policy.  (See Stats. 1994, ch. 40, § 3, p. 379 [amending former § 21320 regarding safe harbor proceedings]; Stats. 1995, ch. 730, § 11, p. 5480 [expanding the express scope of former § 21306]; Stats. 2000, ch. 17, §§ 5-7, pp. 73-75 [adding former § 21305, subd. (a)-(c) to reduce the actions that would be considered a contest and to specify eight public policy exceptions to enforcement of a no contest clause, including several actions relating

---

[6]     The 1989 legislation also established the safe harbor declaratory relief procedure as a method of determining whether a particular motion, petition or other act by a beneficiary would be a contest within the terms of the particular no contest clause.  (Former § 21305, Stats. 1989, ch. 544, § 19, p. 1825.)  When the Probate Code was repealed and reenacted in 1990, the substance of the 1989 no contest clause provisions was continued, although section 21305 became former section 21320, which was limited to instruments that were or had become irrevocable.  (Stats. 1990, ch. 79, § 14, pp. 463, 972.17.)

to fiduciaries; amending former § 21320, subd. (a) regarding safe harbor proceedings].)

In 2002, the Legislature for the first time distinguished "direct contests" and "indirect contests." A "direct contest" was defined as a pleading in a court proceeding that alleged "the invalidity of an instrument or one or more of its terms" based on 10 specified grounds, including, inter alia, revocation, lack of capacity, fraud, undue influence, lack of due execution, and forgery. (Former § 21300, subd. (b), Stats. 2002, ch. 150, § 1, p. 757.) An " '[i]ndirect contest' " was defined as a pleading "that indirectly challenges the validity of an instrument or one or more of its terms based on any other ground not contained in [the statutory list of direct contests]." (Former § 21300, subd. (c).) Reading the former statute and the applicable common law together, we described an indirect contest as "one that attacks the validity of an instrument by seeking relief inconsistent with its terms." (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 605.)

In 2002, the Legislature also added four further matters that would not violate a no contest clause as a matter of law. (Former § 21305, subds. (b)(9)-(12), (d), Stats. 2002, ch. 150, § 2, pp. 757-758.)[7] In addition, the Legislature expressly authorized the safe harbor procedure for a pleading that alleged a public policy exemption from the operation of a no contest clause. (Former § 21320, subd. (a), Stats. 2002, ch. 150, § 3, p. 758.) The 2002 amendments were again in significant part intended as clarification of the law as it had continued to be developed in the courts. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d

---

[7]     The 2002 legislation specified that three of the then 12 listed public policy exemptions would not apply if the challenge was found to be a direct contest. (Former § 21305, subd. (e) [referencing subd. (b)(6), (9) & (11)].)

14

reading analysis of Sen. Bill No. 1878 (2001-2002 Reg. Sess.) as amended June 17, 2002.)

The effort by the Legislature to clarify the law was not, however, entirely successful. The complexity of the statutory scheme actually promoted further uncertainty as to the scope of application of a no contest clause, which in turn led to widespread use of the safe harbor declaratory relief procedure. The frequent use of the safe harbor procedure added an additional layer of litigation to probate matters, which undermined the goal of a no contest clause in reducing litigation by beneficiaries. (Revision of No Contest Clause Statute (Jan. 2008) 37 Cal. Law Revision Com. Rep. 359, 381 (Revision Report).) In 2005, the Legislature asked the Commission to once again study the advantages and disadvantages of enforcing a no contest clause in a will, trust, or other estate planning instrument. (Sen. Conc. Res. No. 42, Stats. 2005 (2005-2006 Reg. Sess.) res. ch. 122, p. 6159.)

In 2008, the Commission issued a report recommending retention, but with significant revision, of the no contest clause statutes. (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at pp. 391-399.)[8] According to the Commission, no contest clauses are still supported by a number of important public policy interests, including respecting a transferor's ability to control the use and disposition of his or her own property and to avoid the cost, delay, public exposure, and additional discord between beneficiaries involved in litigation over the transferor's estate plan. (Revision Rep., at pp. 364-366.) When the proper disposition of a transferor's property is complicated by difficult property characterization issues, a

---

[8] "Explanatory comments by a law revision commission are persuasive evidence of the intent of the Legislature in subsequently enacting its recommendations into law." (*Brian W. v. Superior Court* (1978) 20 Cal.3d 618, 623.)

no contest clause may also appropriately operate as a "forced election" in order to avoid ownership disputes.**9** (*Id.*, at pp. 367-368.)

The Commission acknowledged, however, that other public policy concerns "can trump a transferor's intention to create a no contest clause." (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 369.) It noted that as a matter of general public policy, "a person should have access to the courts to remedy a wrong or protect important rights." (*Ibid.*) The Commission stated that a no contest clause should be applied conservatively to avoid a forfeiture that is not intended by the transferor. (*Id.*, at pp. 369-370.) The Commission agreed that judicial proceedings may be necessary to determine a transferor's intentions. (*Id.*, at pp. 370-372.) And it emphasized that important public policy interests support judicial supervision of an executor, trustee, or other fiduciary. (*Id.*, at p. 372.)

---

**9** The Commission gave the following example of a beneficial use of a forced election: "A decedent is survived by his wife of many years. It was a second marriage for both spouses, each of whom had significant separate property assets of their own. Over the years of their marriage it became increasingly difficult to characterize ownership of their assets as separate or community property . . . . Rather than put his beneficiaries to the expense and delay that would be required for a thorough property characterization, the transferor uses a no contest clause to avoid the issue. [¶] The transferor claims that all of the disputed assets are his separate property, gives a gift to his surviving wife that is clearly greater than the amount she would recover if she were to contest the property characterization, and includes a no contest clause. This forces the surviving spouse to make a choice between acquiescing in the decedent's estate plan and taking the amount offered under that plan, or forfeiting that amount in order to pursue her independent rights under community property law. [¶] If the offer made in the estate plan is fair to the surviving spouse, she can save the estate money and time by accepting the gift offered . . . ." (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 367.) Other situations, beside the disposition of marital property, may give rise to a similar type of "forced election." (*Id.*, at p. 368.)

16

Nevertheless, in light of the identified policy interests in favor of no contest clauses, the Commission recommended against making any fundamental substantive change to the existing no contest clause statutes. (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 391.) "As under existing law, a no contest clause should be enforceable unless it conflicts with public policy." (*Ibid.*)

To address the "most common and serious problem" of uncertainty in application of the existing law (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 382), the Commission recommended a simplification of the statutes. (*Id.*, at p. 392.) As pertinent here, the Commission proposed to narrowly define the types of contest subject to a no contest clause, in place of the existing "open-ended definition of 'contest,' combined with a complex and lengthy set of exceptions." (*Ibid.*) Under such a statutory scheme, "any pleading that is not one of the expressly covered types would not be governed by a no contest clause" without the need for any further analysis. (*Ibid.)*

According to the Commission, "[o]ne of the main benefits of limiting the enforcement of a no contest clause to an express and exclusive list of contest types is that the existing attempt to describe public policy exceptions can be abandoned," eliminating "a significant source of complexity and confusion in existing law." (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 395.) Although enforcement of a no contest clause against an indirect contest would be eliminated, the Commission believed that the substantive effect of such a change "would be relatively modest." (*Ibid.*) "Existing law already exempts nearly all types of indirect contests from the operation of a no contest clause (other than forced elections)" and, when the existing list of public policy exceptions does not apply, "the gap in coverage is probably inadvertent." (*Id.*, at p. 395 & fn. 95.) "The policy implication of that trend is clear. A beneficiary should not be punished for bringing an action to ensure the proper interpretation, reformation, or

17

administration of an estate plan. Such actions serve the public policy of facilitating the fair and efficient administration of estates and help to effectuate the transferor's intentions . . . . [¶] The proposed law would merely extend that principle to its logical end . . . ." (*Id.*, at p. 395.)

Accordingly, the Commission recommended that a no contest clause should be enforceable only in response to three types of contests: (1) a direct contest, as specifically defined, brought without probable cause; (2) a creditor claim; and (3) a challenge to a transfer of property amounting to a forced election. (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at pp. 392-394, 397.)

In response to the Commission's report, the Legislature repealed the existing statutes and replaced them with a new set of statutes governing no contest clauses, essentially as recommended by the Commission. (Stats. 2008, ch. 174, §§ 1, 2, p. 567 [repealing former § 21300 et seq., and adding § 21310 et seq.]; Sen. Rules Com., Floor Analysis of Sen. Bill No. 1264 (2007-2008 Reg. Sess.) as amended June 18, 2008.) Effective on January 1, 2009, operative on January 1, 2010, and applying to instruments that became irrevocable on or after January 1, 2001, the new statutory provisions generally limit enforceability of the no contest clause to (1) direct contests brought without probable cause; (2) challenges to the transferor's ownership of property at the time of the transfer, if expressly included in the no contest clause; and (3) creditor's claims and actions based on them, if expressly included in the no contest clause. (§§ 21311, subd. (a)(1)-(3), 21315; Stats. 2008, ch. 174, §§ 2, 3, p. 568.) The new law discontinued the safe harbor declaratory relief procedure of former section 21320. (Stats. 2008, ch. 174, § 1, p. 567.)

With this background in mind, we consider whether the beneficiaries may litigate their proposed petition in this case without risk of disinheritance by operation of the no contest clauses of the amended Family Trust instrument.

18

**IV. APPLICATION OF THE LAW TO THE CLAIMS PROPOSED TO BE FILED BY THE BENEFICIARIES IN THEIR 2009 SAFE HARBOR APPLICATION**

**A. The beneficiaries' safe harbor application was not subject to dismissal after the current law became operative.**

Section 3, subdivision (c), provides that "[s]ubject to the limitations provided in this section, *a new law applies on the operative date to all matters governed by the new law*, *regardless of whether an event occurred* or circumstance existed *before*, on, or after *the operative date, including, but not limited to, . . . commencement of a proceeding*, . . . , or taking of an action. (Italics added.) Subdivision (d) of section 3 further provides that "[i]f a petition, . . . is filed before the operative date, the contents, execution, and notice thereof are governed by the old law and not by the new law; but *any subsequent proceedings taken after the operative date concerning the petition, . . . , including an objection or response, a hearing, an order, or other matter relating thereto is governed by the new law* and not by the old law." (Italics added.)

The current law regarding no contest clauses became operative on January 1, 2010, while the beneficiaries' safe harbor application was still pending. Safe harbor proceedings are not, however, matters "governed" by the current law, which discontinued the use of such proceedings and provides no procedures for those actions that may have been pending when the new law took effect. Although the current law repealed former section 21320, which authorized safe harbor applications (see fn. 5, *ante*), nothing in the current law suggests that safe harbor applications pending when the current law became operative were subject to dismissal. Instead, procedurally, the cause was properly before the probate court under the rule provided by section 3, subdivision (g), which states that "[i]f the new law does not apply to a matter that occurred before the operative date, the old law continues to govern the matter notwithstanding its amendment *or repeal* by the new law." (Italics added.) Therefore, the trial court did not err as a

19

procedural matter in ruling on the beneficiaries' pending safe harbor application after the operative date of the current law.

> **B.  The current law was presumptively applicable to the substantive merits of the beneficiaries' safe harbor application and, under such law, the no contest clauses of the amended Family Trust instrument are unenforceable.**

We conclude, however, that concerning the substantive legal issue of whether the no contest clauses of the Family Trust instrument are enforceable against the beneficiaries' proposed claims, the current law was presumptively applicable because the Family Trust instrument became irrevocable after January 1, 2001.  (§ 21315, subdivision (a).)  And under the current law, the no contest clauses are not enforceable against the claims that the beneficiaries have sought to raise by their proposed petition.  We explain.

In proposing the current law, the Commission was plainly aware of the issue of retroactive or prospective application of the proposed law.  Its staff expressly advised the Commission regarding the transitional issues presented by an adoption of new no contest clause statutes.  (Cal. Law Revision Com., First Supp. to Memo. 2008-3, Revision of No Contest Clause Statute (Transitional Issues) (Jan. 15, 2008) pp. 1-15 (First Supplement).)  In particular, staff brought to the attention of the Commission "two significant benefits to retroactive application of the proposed law." (*Id.*, at p. 6.)  First, the public policy interests in allowing actions to determine or preserve the transferor's intentions or supervise a fiduciary without deterrence by a no contest clause apply equally to all instruments, whenever executed.  (*Ibid.*)  Second, retroactive application would significantly simplify the law going forward.  (*Id.*, at pp. 6-7.)  However, staff pointed out, full retroactive application of the proposed law could, among other things, defeat a transferor's expectations, which were presumably based on and relied on application of the law in existence at the time of executing an estate plan.  (*Id.*, at

20

p. 7.) As an alternative to full retroactivity, staff suggested partial retroactivity, which "would achieve some of the simplification benefits of retroactive application, without creating the problems posed by full retroactivity." (*Id.*, at p. 12.)

The Commission adopted its staff's partial retroactivity suggestion and recommended to the Legislature a carefully designed scheme of effective and operative dates for the proposed law. Specifically, the Commission proposed that the new statutes should have a one-year deferred operation date in order to provide a "grace period" for those who wished to revise their estate plans before the new law took effect. (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 398.) But, once the proposed law became operative, the Commission proposed that "it would apply to any instrument, whenever executed, with one exception. It would not apply to an instrument that became irrevocable before January 1, 2001." (*Id.*, at pp. 398-399.) The January 1, 2001 date was chosen to "preserve existing law as to instruments that became irrevocable before the enactment of the existing scheme of statutory exceptions to the enforcement of a no contest clause." (*Id.*, at p. 399.)[10]

The Commission noted that "[w]here there are differences in the effect of the proposed law and existing Section 21305, the retroactive application of the proposed law to January 1, 2001, would be limited by the exceptions provided in Probate Code Section 3," including the "general exception that allows a court to

---

[10] In 2002, the Legislature expressly precluded retroactive application of the statutory public policy exceptions by limiting the application of former section 21305, subdivision (b) to instruments of decedents dying post-2000 and to documents that become irrevocable post-2000. (Former § 21305, subd. (d); Stats. 2002, ch. 150, § 2, p. 758; see First Supp., *supra*, at pp. 5-6.)

apply prior law if it determines that retroactive application of the new law would substantially interfere with the rights of interested persons." (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 399; see First Supp., *supra*, at pp. 1-4.) Section 3, subdivision (h), thus, would "provide[] a general fairness exception to the retroactive application of new law." (First Supp., *supra*, at p. 3.)

The Legislature adopted the recommendation of the Commission. Effective on January 1, 2009, and operative on January 1, 2010, section 21315, subdivision (a), provides that the current no contest clause statutes apply "to any instrument, whenever executed, that became irrevocable on or after January 1, 2001." (§ 21315, subd. (a).)

As recommended by the Commission, section 21315 itself provides no exception to the applicability of the current law to instruments that became irrevocable on or after January 1, 2001. It appears clear from the legislative history we have described that the Legislature fully intended the current law to be applied to instruments drafted years before the current law's operative date as long as the instrument became irrevocable on or after January 1, 2001, the date when the former law's statutory scheme of exceptions to the enforceability of no contest clauses became effective. Application of the current law to such category of instruments was reasonable because, as explained by the Commission's report, the current law would not likely change the substantive result regarding the enforceability of a no contest clause in those instruments. (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 395.)

Rodney died in 2002. Mary died in 2005. Thus, the Family Trust instrument became irrevocable after January 1, 2001, and by the terms of section 21315, subdivision (a), the current substantive law governing no contest clauses is applicable.

22

The successor trustees argue that the no contest clauses of the amended Family Trust instrument should be enforceable against the beneficiaries' claims under the current law. We disagree.

Section 21311, subdivision (a), of the current law provides in full as follows: "A no contest clause shall *only* be enforced against the following types of contests: [¶] (1) A direct contest that is brought without probable cause. [¶] (2) A pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application. [¶] (3) The filing of a creditor's claim or prosecution of an action based on it. A no contest clause shall only be enforced under this paragraph if the no contest clause expressly provides for that application." (Italics added.)

The effect of this statute is to make the trust's no contest clauses unenforceable unless the beneficiaries' proposed action is covered by one of the three specified categories of contest.

The successor trustees do not contend that the beneficiaries' proposed petition is a "direct contest" under the current law. (§§ 21310, subds. (a) & (b), 21311, subd. (a)(1).) Nor do they contend that the beneficiaries' challenges assert a creditor's claim under subdivision (a)(3) of section 21311. But the successor trustees do argue that subdivision (a)(2) of section 21311, relating to forced elections, is applicable to the beneficiaries' proposed petition. According to the successor trustees, the beneficiaries' claims challenge a transfer of property (the assets in Decedent's Trust B) within the meaning of subdivision (a)(2) and therefore, the trust's no contest clauses are enforceable under the current law. To the contrary, the no contest clauses are unenforceable under the terms of section 21311, subdivision (a)(2).

23

Legislative history makes it clear that the Legislature intended, in enacting section 21311, subdivision (a)(2) to allow the continued enforcement of a no contest clause in order to facilitate a forced election.

Specifically, the current law was enacted upon the recommendation of the Commission after the Commission reflected and reported on the respective advantages and disadvantages of enforcing a no contest clause. Among the issues considered by the Commission was the historic use of a no contest clause to resolve disputes over the character of the property being transferred — in essence, the extent of the transferor's ownership of the property. In its 2008 report, the Commission explained that "[i]n some cases, the proper disposition of a transferor's property may be complicated by difficult property characterization issues." (Revision Rep., *supra,* 37 Cal. Law Revision Com. Rep. at p. 367.) The Commission gave as an example a situation in which successive marriages resulted in difficult community property characterization issues, which could be avoided by forcing the surviving spouse to make a choice between accepting an amount offered through the decedent's estate plan or pursuing his or her independent community property claim. (*Ibid.*; see fn. 10, *ante.*) As another example, the Commission noted that "business partners may have mingled assets in a way that would make proper division difficult . . . ." (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 368.) In such cases, the Commission reflected, "a no contest clause and a sufficiently generous gift can resolve the matter without litigation." (*Ibid.*) The no contest clause forces the beneficiary to make an election.[11] (See generally *Burch, supra,* 7 Cal.4th at pp. 265-266

---

[11]   As one case described the situation: "A no contest clause may result in a 'forced election' where a beneficiary is obligated to choose between two inconsistent or alternative rights or claims because the testator or trustor clearly

*(Footnote continued on next page.)*

[describing with approval the use of a forced election in the community property context].)

The Commission acknowledged a potential for misuse of such a forced election (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at pp. 372-374), but it ultimately concluded, after a survey of the views of trust and estate attorneys, probate judges, and elder law practitioners (Cal. Law Revision Com., Memo. 2007-7, Revision of No Contest Clause Statute: Practitioner Survey (Feb. 21, 2007) pp. 1, 4-5), that the incidences of a forced election deterring a reasonable claim of ownership of estate assets were rare and that there was no consensus for significant reform of the use of a no contest clause to force an election. (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at pp. 389-390.) The Commission proposed that the ability of a transferor to use a no contest clause to create a forced election be continued, but recommended narrowing of the existing statutory language, which referred to any "action or proceeding to determine the character, title, or ownership of property" (former § 21305, subd. (a)(2); Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep., *supra*, at p. 394.) The Commission proposed statutory language that instead allowed a no contest clause to be enforced against: "A pleading to challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer," provided "the no contest clause expressly provides for that application." (Revision Rep., at p. 402; see *id*., p. 394.) Accepting the recommendation (see Sen. Com.

---

*(Footnote continued from previous page.)*

intended that the beneficiary not enjoy both. [Citation.] Put another way, a claimant cannot at the same time take the benefits under a testamentary instrument and repudiate the losses; [he or] she must accept the terms in toto, or reject them in toto." (*Colburn v. Northern Trust Co.* (2007) 151 Cal.App.4th 439, 447.)

25

on Judiciary, Analysis of Sen. Bill No. 1264 (2007-2008 Reg. Sess.) as amended Mar. 24, 2008, pp. 9-10), the Legislature enacted the language proposed by the Commission, in section 21311, subdivision (a)(2).

Because there is no ambiguity in the language of section 21311, subdivision (a)(2), concerning the requirement that the no contest clause expressly provide for its application to forced election challenges, the plain meaning of the language controls. (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) Here, the terms of the no contest clauses in the amended Family Trust instrument do not expressly provide that the clauses apply to pleadings that challenge a transfer of property on the grounds that it was not the transferor's property at the time of the transfer. Therefore, even assuming for purposes of the successor trustees' argument that the beneficiaries' claims could be characterized as a challenge to a transfer of property within the meaning of section 21311, subdivision (a)(2), an issue that we expressly do not decide, the no contest clauses cannot be enforced against such claims.

In summary, the trust's no contest clauses cannot be enforced to disinherit the beneficiaries under the current law because the claims alleged in the beneficiaries' proposed petition do not fall into any of the categories of contest set forth in section 21311, subdivision (a).

### C. The Successor Trustees do not qualify for a fairness exception to the presumptive applicability of the current law.

Although the current law is presumptively applicable to instruments that became irrevocable after January 1, 2001, like the Family Trust instrument here, section 3, subdivision (h), provides a "fairness" exception. As we have previously noted, section 3, subdivision (h) provides, in pertinent part: "If a party shows, and the court determines, that application of . . . the new law would substantially interfere with . . . the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date,

26

the court may, notwithstanding this section or the new law, apply . . . the old law to the extent reasonably necessary to mitigate the substantial interference." (See fn. 6, *ante*.) We reject the successor trustees' contention that the fairness exception is applicable in this case.

The successor trustees claim that application of the current law after the death of both Rodney and Mary would unfairly defeat the Donkins' expectations regarding the no contest clauses that they included in the trust documents, thus, substantially interfering with the rights of the parties and other interested persons. As we have explained, however, the Legislature plainly intended that the current law be applied retroactively to instruments that became irrevocable by the death of the trustor(s) even years before the current law became operative, as long as the instrument did not become irrevocable before 2001. Thus, the mere fact that a trust instrument was drafted in reliance on the former law and became irrevocable before the operative date of the current law is not sufficient to invoke the fairness exception in subdivision (h) of section 3.

Rather, as the Commission explained, it is "[w]here there are differences in the effect of the proposed law and existing Section 21305, [that] the retroactive application of the proposed law to January 1, 2001, would be limited by the exceptions provided in Probate Code Section 3," including the "general exception that allows a court to apply prior law if it determines that retroactive application of the new law would substantially interfere with the rights of interested persons." (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 399; see also First Supp., *supra*, at pp. 1-4.) That is, unless a party can show that a different result would obtain under the former law on which the transferor relied when executing the estate plan, the current law applies retroactively to January 1, 2001. In most cases there will be no difference in result between the former law and the current law (Revision Rep., *supra*, 37 Cal. Law Revision Com. Rep. at p. 395 [substantive

27

effect of current law will be "relatively modest"]) and the fairness exception will be inapplicable. We turn to a consideration of whether the application of the former law to the beneficiaries' claims in this case would lead to a different result.

The successor trustees contend that under the former law, the beneficiaries' claims would trigger the no contest clauses of the Family Trust instrument and of the Trust's Second Amendment because the claims constitute an attack on the validity of the terms of the trust within the meaning of former section 21300, subdivision (c), and related case law. (See former § 21300, subd. (c) [defining as an "indirect contest" a pleading "that indirectly challenges the validity of an instrument or one or more of its terms" based on a ground not enumerated as a "direct contest" in subdivision (b) of the section], Stats. 2002, ch. 150, § 1, p. 757.)

As noted earlier, turning both to this former statute and to case law defining the term "indirect contest," we defined the term as referring to a claim "that attacks the validity of an instrument by seeking relief inconsistent with its terms." (*Johnson v. Greenelsh, supra,* 47 Cal.4th at p. 605.) We also referred to such challenges as those that would thwart the testator's distributive scheme. (*Id.,* at p. 606.) The successor trustees claim that the beneficiaries' claims violate the trust's no contest clauses because they attack the validity of the amended instrument and challenge its distributive scheme.

We are not persuaded because we believe that the beneficiaries' claims, although sometimes couched in terms suggesting they are arguing the validity of the Trust's Second Amendment, at bottom seek an *interpretation* of the Family Trust instrument, rather than to void any portion of it or to set aside its distributive plan. Such calls for interpretation do not violate no contest clauses.

We begin with former section 21305, subdivision (b). It provides that "notwithstanding anything to the contrary in any instrument, the following

28

proceedings do not violate a no contest clause as a matter of public policy" and lists a number of types of claims, including one that governs here. (Stats. 2002, ch. 150, § 2, p 758.) Former section 21305, subdivision (b)(9) lists "[a] pleading *regarding the interpretation of the instrument* containing the no contest clause or an instrument or other document expressly identified in the no contest clause." (Italics added.)[12]

Under the common law, too, disputes over the interpretation of instruments were not ordinarily seen as violating a no contest clause. "Rather than thwarting the testator's dispositive intent, the proceeding serves to ascertain and enforce that intent." (*Estate of Strader* (2003) 107 Cal.App.4th 996, 1004, relying on *Estate of Kruse* (1970) 7 Cal.App.3d 471, 476; see *Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 258.)

A proposed pleading concerns the interpretation of an instrument when its allegations put in issue a provision or term of the instrument that "is ambiguous and requires judicial interpretation." (*Cory v. Toscano* (2009) 174 Cal.App.4th 1039, 1044.) As we shall see, even the successor trustees' own arguments make it plain that the issue in dispute is the proper interpretation of ambiguous provisions of the amended Family Trust instrument.

---

[12] Former section 21305, subdivision (d) provides that subdivision (b)(9), (11), and (12) applies only to instruments of decedents dying on or after January 1, 2003, and to documents that became irrevocable on or after January 1, 2003. (Former § 21305, subd. (d), Stats. 2002, ch. 150, § 2, p. 758.) Former section 21305, subdivision (b)(9), is applicable under former section 21305, subdivision (d), to the beneficiaries' action seeking a determination of the effect of the Trust's Second Amendment because Mary died in 2005, and the Family Trust instrument as amended by the Trust's Second Amendment became irrevocable in 2005.

The beneficiaries proposed to file a petition seeking a determination of various issues pertaining to the administration of the Family Trust. Their proposed petition objected to the two accountings that had been provided to them by the successor trustees, claiming that the accountings were inadequate and disclosed inappropriate transactions and excessive fees by the successor trustees. The beneficiaries alleged that the accountings failed to disclose any segregation of the original trust estate into separate trusts after the death of Rodney, as required by the terms of the Family Trust instrument. Further, they alleged that the successor trustees had failed to make any distribution of Decedent's Trusts B and C after the death of Mary, as required by the terms of the trust agreement. The beneficiaries' proposed petition sought (1) to compel a proper accounting, (2) to fix the compensation of the successor trustees and surcharge them for any excess fees, (3) to remove the successor trustees from office for misfeasance, and (4) to compel the distribution of the assets of Decedent's Trusts B and C.

The successor trustees argue that at least some of these claims amount to an indirect contest under the former law, thereby triggering the no contest clauses of the amended Family Trust instrument. Specifically, the successor trustees contend that the language used by Mary in the replacement "allocation" paragraph of the Trust's Second Amendment clearly manifested her intent to amend the provisions of the entire Family Trust and to allow the successor trustees to control the disposition of all of the assets owned by the Family Trust, regardless of which subtrust owns them.[13] That is, they urge a particular *interpretation* of the amended allocation paragraph. They argue that, as the Court of Appeal

---

[13] The successor trustees fail to explain their interpretation of the Trust's Second Amendment's retention and republication of the "distribution" paragraph of the Family Trust instrument.

30

concluded, the beneficiaries' challenges to Mary's failure to create the subtrusts required by the Family Trust instrument, Mary's legal authority and ability to amend the Family Trust as set out in the Trust's Second Amendment, and the successor trustees' failure to make distributions, would, if pursued, constitute a contest under the no contest clauses because these claims legally challenge and attack the distributive scheme of the Family Trust, as they interpret that scheme.

The successor trustees' argument, however, is premised on a description of the nature of the beneficiaries' claim that is not accurate. As we understand the beneficiaries' argument, the beneficiaries are not challenging the actions of Mary in executing the Trust's Second Amendment per se, nor do they argue that the Trust's Second Amendment is void. Rather, the beneficiaries argue in favor of an interpretation of the Family Trust instrument, including the Trust's Second Amendment, different from the one urged by the successor trustees. The beneficiaries' contentions seek to establish the meaning of the instrument's terms through an understanding of what they view as Mary's probable intent. They argue that because Mary possessed only limited authority after the death of Rodney to alter the provisions of the Family Trust and could not validly amend the trust with respect to his Decedent's Marital Share, the new paragraph substituted by the Trust's Second Amendment regarding the allocation of trust assets after Mary's death must have been intended by her to govern, and should be interpreted to govern, only the assets of Survivor's Trust A. Consistent with this interpretation, the beneficiaries argue that the trust's distribution paragraph, left unaltered by the Trust's Second Amendment, required the assets of the Decedent's Trusts B and C to be distributed "outright as soon as is practicable" after the death of Mary.

The allocation paragraph of the Family Trust instrument, as amended by the Trust's Second Amendment, does not expressly refer to Survivor's Trust A and

31

Decedent's Trusts B and C. It does not state whether, or how, its provisions are applicable to the subtrusts. Nor is there language in the Trust's Second Amendment explaining how its new allocation provisions operate with the distribution paragraph in the Family Trust that the Trust's Second Amendment confirmed and republished. In the context of these ambiguities, the successor trustees and the beneficiaries advocate for different interpretations of the language of the amended Family Trust instrument.

In the present setting, the exception provided in former section 21305, subdivision (b)(9), applies, as a matter of law, because, fairly understood, the beneficiaries' claims seek to resolve issues regarding the interpretation of the Family Trust instrument as amended by the Trust's Second Amendment. The Court of Appeal erred in failing to apply the exception and in concluding, instead, that the beneficiaries' assertion of their interpretation of the amended trust instrument and request for distribution violated the no contest clauses of the amended Family Trust instrument under the former law.

The remainder of the beneficiaries' proposed claims fall within public policy exceptions for challenges to fiduciary misconduct and, therefore, as a matter of law, also do not violate the no contest clauses of the amended Family Trust instrument under the former law. Specifically, the beneficiaries allege that the accountings of the successor trustees are inadequate and disclose misfeasance of the successor trustees through inappropriate transactions and excessive fees. They complain about the failure of the successor trustees to reflect in a 2006 accounting the segregation of the trust estate into the required subtrusts[14] and their

---

[14] As we have earlier described, on the death of the first spouse (Rodney), the Family Trust instrument required the surviving trustee (Mary) to divide the trust estate into two shares — a survivor's share that was to be designated "Survivor's

*(Footnote continued on next page.)*

failure to distribute the assets of the decedent's subtrusts. The beneficiaries seek an order compelling a new accounting, fixing the compensation of the successor trustees, surcharging them for any excess fees, and removing them from office for misfeasance. Substantively, these portions of the beneficiaries' proposed action allege that the successor trustees have failed in their fiduciary duty to administer the trust according to its terms (§ 16000) and have failed in their duty to properly report and account on their administration of the trust. (§§ 16061, 16062, 16063.) Such challenges to the actions of the successor trustees are covered by several of the public policy exceptions contained in the former law. Specifically, the former law provided that "notwithstanding anything to the contrary in any instrument," pleadings "regarding an accounting or report of a fiduciary," pleadings that "challeng[e] the exercise of a fiduciary power," pleadings that seek "to compel an accounting or report of a fiduciary," and pleadings that seek "the removal of a fiduciary" "do not violate a no contest clause as a matter of public policy." (Former § 21305, subd. (b)(6), (7), (8), & (12).)

As explained by the court in *Bradley v. Gilbert* (2009) 172 Cal.App.4th 1058, when it was examining the scope and application of former section 21305,

_____

*(Footnote continued from previous page.)*

Trust A" and a decedent's share that was to be designated "Decedent's Marital Share." The trust assets allocated to the Decedent's Marital Share were to be further divided into the bypass subtrust and the marital deduction subtrust as determined by the application of the specified formula. In complaining that the accounting did not reflect that the trust estate had been segregated into the required subtrusts, the beneficiaries contend that they are challenging the actions of the successor trustees, not the actions of Mary. And, indeed, their proposed petition does not allege a failure by Mary to create the subtrusts, but a failure of the successor trustees to properly report and account for the subtrusts. The Court of Appeal misconstrued the claims of the beneficiaries to the extent it found otherwise.

subdivision (a)(6), to the circumstances before it: "[A] beneficiary should be able to question the actions of a faithless fiduciary without being subject to the restrictions of [a no contest] clause: '[T]he Legislature has determined that in furtherance of the public policy of eliminating errant fiduciaries, a beneficiary who believes a fiduciary is engaged in misconduct should be able to bring the alleged misconduct to the court's attention without fear of being disinherited.' [Citation.] To place barriers to a court's review of alleged fiduciary misconduct would, moreover, be contrary to well-established policy to ensure that estates are properly administered." (*Bradley v. Gilbert, supra*, at p. 1071.) Here, the beneficiaries are arguing that the successor trustees engaged in misconduct when they failed to carry out the terms of the Family Trust instrument, as interpreted by the beneficiaries. Such a claim is permitted as a matter of public policy under the former law.[15]

---

**15** Notwithstanding the parties' arguments, in concluding that several of the public policy exceptions expressed in former section 21305, subdivision (b), are applicable to the beneficiaries' proposed claims here, it is unnecessary to embark on any extended consideration of the case law prior to the 2000 statutory amendments that added former section 21305 to the former no contest clause law (see, e.g., *Estate of Ferber, supra,* 66 Cal.App.4th 244; *Estate of Parrette* (1985) 165 Cal.App.3d 157) or the post-2000 case law regarding the enforcement of no contest clauses against allegations concerning fiduciaries. (See, e.g., *Fazzi v. Klein* (2010) 190 Cal.App.4th 1280; *Hearst v. Ganzi* (2006) 145 Cal.App.4th 1195.) As we have previously described, the law in California regarding no contest clauses has evolved over the course of many years, with an incremental specification by common law and statutory amendment of numerous public policy exceptions to the enforcement of no contest clauses. A number of the statutory public policy exceptions cover the beneficiaries' allegations of misconduct by the successor trustees under the circumstances of this case. We need not consider the circumstances presented by different cases at other points in time.

34

The successor trustees are not aided by subdivision (c) of former section 21320, which precluded a ruling in a safe harbor proceeding if a determination of the merits of the beneficiary's proposed claim was required. As a matter of law, and without the necessity of resolving the merits, the nature of the issues raised by the beneficiaries' proposed petition exempts the beneficiaries' proposed action from the no contest clauses for reasons of public policy expressed by the former law. (*Estate of Ferber, supra,* 66 Cal.App.4th at p. 251.) It is up to the court or arbitrator to rule on the merits of the parties' conflicting interpretation of the trust instrument in the future, if the beneficiaries choose to pursue their claims.

Finally, the successor trustees cannot establish that under the former law the beneficiaries have already violated the no contest clauses by their filing of a request for an order of the probate court compelling arbitration of their claims or by their filing of the safe harbor application in lieu of proceeding to arbitration.[16] If, as we conclude, the substantive claims raised by the beneficiaries do not as a matter of law violate the no contest clauses on grounds of public policy, as expressed in the former law, the beneficiaries are not disinherited by the assertion of those claims in court or in arbitration. Nor did the filing of the safe harbor application, prior to commencing arbitration, trigger the no contest clauses under the former law, as the successor trustees argued. A ruling under former section 21320, subdivision (a), determines neither the merits of the proposed claims nor

---

[16] Although not expressly addressed by the probate court in its order, the successor trustees raised such arguments in their response to the beneficiaries' safe harbor application, as well as in their petition for instructions. Therefore, the arguments may fairly be read as having been implicitly rejected by the probate court. Accordingly, we reject the successor trustees' claim that the Court of Appeal lacked jurisdiction (and implicitly that we lack jurisdiction) to consider whether the beneficiaries triggered the no contest clauses by their actions or inaction regarding arbitration of their claims.

the appropriate forum for assertion of those claims. (Former § 21320, subds. (b), (c).) It determines only whether pursuit of the claims will result in disinheritance under the terms of the no contest clauses and the law governing them. (*Id.*, subd. (a).)

In summary, we conclude that if the former law were to be applied the beneficiaries could pursue their proposed claims without risk of being disinherited. Because this is the same result that is reached by applying the current law, the successor trustees cannot qualify for the fairness exception provided in section 3, subdivision (h).

## V. DISPOSITION

The judgment of the Court of Appeal is reversed.

CANTIL-SAKAUYE, C. J.


WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Donkin v. Donkin

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 204 Cal.App.4th 622
**Rehearing Granted**

_____

**Opinion No.** S202210
**Date Filed:** December 26, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Reva G. Goetz

_____

**Counsel:**

Snow Law Corporation and Stephen L. Snow for Defendants and Appellants.

Mark H. Boykin for Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen L. Snow
Snow Law Corporation
28212 Kelly Johnson Parkway, Suite 195
Valencia, CA  91355
(661) 259-9443

Mark H. Boykin
6355 Topanga Canyon Boulevard, Suite 420
Woodland Hills, CA  91367
(818) 883-0871