Filed 4/3/20

# CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANNEMARIE DONKIN et al., | B293127 |
| Plaintiffs and Respondents. | (Los Angeles County Super. Ct. No. BP109463) |
| v. | |
| RODNEY E. DONKIN, JR., et al. as Trustees, etc., | |
| Defendants and Appellants, | |

APPEAL from an order of the Superior Court of Los Angeles County, David J. Cowan, Judge.  Affirmed.

Rodney E. Donkin, Jr., in pro. per., for Defendant and Appellant Rodney E. Donkin, Jr., as Trustee, etc.

Vicki R. Donkin, in pro. per., for Defendant and Appellant Vicki R. Donkin, as Trustee, etc.

Mark H. Boykin for Plaintiffs and Respondents Annemarie Donkin and Lisa B. Kim.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Factual and Procedural Summary *post*, and the Discussion *post*, parts A. and B.

Appellants Rodney E. Donkin, Jr., and Vicki Rose Donkin (Trustees), as successor trustees of a family trust established by Rodney Donkin, Sr., and Mary Donkin (Trustors), appeal from an order in which the trial court rejected Trustees' proposed interpretation of the trust, reflected in their petition for instructions. Specifically, the court concluded the trust was not a continuing discretionary spendthrift trust and instead obligated Trustees to distribute a portion of the trust estate to respondents Annemarie Donkin and Lisa B. Kim (Beneficiaries) "as soon as is practicable" after both Trustors died. The trial court further concluded that Beneficiaries' efforts seeking such distribution via a petition for surcharge and to account were not barred by the statute of limitations in Probate Code[1] section 16061.8, because these efforts did not constitute an action "contest[ing]" the trust. (§ 16061.8.)

We agree with the trial court on both points. We further reject Beneficiaries' contention that, because the Trustees represent themselves in their dispute with Beneficiaries regarding the interpretation of the trust, the Trustees engaged in the unauthorized practice of law. Accordingly, we affirm.

---

[1] Unless otherwise indicated, all further statutory references are to the Probate Code.

## FACTUAL AND PROCEDURAL SUMMARY

### A. *The Donkin Family Trust*

In August 1988, Rodney E. Donkin (Rodney, Sr.)[2] and Mary E. Donkin (Mary), a married couple, executed a revocable trust as part of their estate plan, which they then amended in 2002 (the trust document).[3] According to the trust document, the primary beneficiaries of the trust after the death of both Trustors were their children: Rodney E. Donkin, Jr. (Rodney, Jr.); Lisa B. Kim (Lisa); and Annemarie N. Donkin (Annemarie). "Rodney Jr. and his wife Vicki R. Donkin were named as '[f]irst' co-successor trustees, while Lisa and Annemarie . . . were relegated to the position of '[s]econd' co-successor trustees."[4] (*Donkin II, supra*, B266036, at p. 4.)

The trust document provides that, upon the death of the first Trustor (the predeceasing spouse or decedent), "the Trustee shall divide the Trust Estate into two . . . separate shares": (1) the "Survivor's Trust" (Trust A), consisting of the surviving spouse's interest in Trustors' community property and

---

[2] To avoid confusion, we use first names to identify the various members of the Donkin family. No disrespect is intended thereby.

[3] The effect of the 2002 amendment is not at issue on appeal.

[4] In our March 2017 unpublished opinion, *Donkin v. Donkin* (Mar. 29, 2017, B266036) (*Donkin II*), we summarized many of the key underlying facts of the dispute between the parties. We republish portions of that summary in our recitation of the relevant factual background.

the surviving spouse's separate property, and (2) the "Decedent's Marital Share," consisting of the predeceasing spouse's interest in the community property and the predeceasing spouse's separate property.  (Underlining omitted.)

Upon the death of the surviving spouse, the trust document requires the trustee to further divide the decedent's marital share into decedent's Trust B and decedent's Trust C.  The trustee is to include in Trust B only assets in an amount up to the maximum marital deduction from federal estate tax,[5] and to allocate the remainder of the marital share to Trust C.

---

[5] In *Donkin v. Donkin* (2013) 58 Cal.4th 412, 416 (*Donkin I*), the California Supreme Court explained the marital deduction and its role in estate planning as follows:  "Federal law allows the property of a deceased spouse to be passed to the surviving spouse without payment of federal estate tax through the allowance of a 'marital deduction.'  (Int.Rev.Code, § 2056.)  The value of the estate of the surviving spouse is increased by such a passage of assets and it may be enlarged to the point where it will exceed the federal unified tax credit allowable to the estate when the surviving spouse dies.  (*Id.*, § 2010 . . . .)  A common method of addressing such a situation, having the purpose of minimizing the estate taxes owed, is to provide for the transfer to the surviving spouse of only as much of the deceased spouse's property as necessary to reduce the deceased spouse's estate tax to zero with use of the applicable federal estate tax exemption.  The property remaining in the deceased spouse's estate is placed in a bypass trust, which makes those assets available for the surviving spouse's use but does not give the surviving spouse rights to the property in the bypass trust that would cause any of the undistributed trust property to be included in the taxable estate of the surviving spouse upon his or her death.  [Citations.]  Thus, 'the undistributed assets of the

### 1.    *Revocability*

"[T]he surviving spouse's Trust A remains revocable" after the predeceasing spouse dies.  By contrast, "[u]pon the death of [the predeceasing] spouse . . . [d]ecedent's Trusts B [and] C . . . become irrevocable."  (Underlining omitted.)  Other provisions in the trust describe Trusts B and C as becoming irrevocable "[u]pon creation of such Trust shares [B and C]."  Given that the trust document obligates the trustee to create shares B and C "[u]pon the death of [the predeceasing] spouse," however, these provisions effectively render Trusts B and C irrevocable upon the death of the predeceasing spouse.  (Underlining omitted.)

"Upon the death of both [Trustors], the entire Trust becomes irrevocable."  (Underlining omitted.)

### 2.    *Allocation and distribution upon the death of the surviving spouse*

The trust further provides that, "[u]pon the death of the Surviving Spouse, the Trustee shall hold, administer and distribute the Trust in the following manner."  The provisions that immediately follow do several things.  First, they allow for the distribution of Trustors' personal property per a separate memorandum Trustors may choose to execute.  Second, they give the trustee discretion "[a]t any time prior to the division of the trust into shares as hereinbefore provided, or prior to distribution if divided," to provide sums for "care and maintenance, medical needs, and education of any primary beneficiary" and to make "Extraordinary Distribution[s]"

---

decedent's estate . . . "bypass" the survivor's estate.' " (*Donkin I, supra*, 58 Cal.4th at p. 416.)

for "worthwhile personal, professional or business goals" of a beneficiary. (Underlining omitted.) Third, they instruct the trustee not to make distributions to any beneficiary deemed by a court to be incompetent, and permit the creation of a special needs trust under such circumstances. Fourth, they instruct the trustee to reduce any beneficiary's share by the amount of any loan or gift made to the beneficiary by the trust.

At the conclusion of these provisions, the trust document identifies the primary beneficiaries and requires that "[w]hen the above conditions are satisfied, the debts and obligations of the Trust Estate have been paid, and any special bequests have been distributed, the Trustee *shall* allocate and divide [the] Trust Estate as then constituted into separate shares so as to provide one share for each of the designated Primary Beneficiaries living at the death of the Surviving Settlor." (Italics added.) Finally, "the Trustee *shall* distribute the shares allocated to Primary Beneficiaries *outright as soon as is practicable*." (Italics added.)

### B. *Mary's Efforts to Amend the Trust Document*

In 2002, Rodney, Sr., died.

In 2004, shortly before her own death, Mary executed an amendment to the trust document (the contested amendment). The contested amendment "did two things. First, it substituted a new paragraph regarding the allocation of the trust assets after her death as the surviving spouse. Instead of directing an immediate allocation and division of the assets into separate shares for the beneficiaries, the new paragraph grants the successor trustees—which would initially be Rodney Jr. and Vicki—'complete discretion' after the death of Mary to retain the assets of the Family Trust intact and to continue to manage the property for the equal benefit of the primary beneficiaries.

6

Among other things, the new paragraph granted the successor trustees 'sole discretion' over distribution of income and principal from the Trust to the beneficiaries." (*Donkin II, supra*, B266036, at p. 5.) The language in the contested amendment did not differentiate between Trusts A, B, and C in any respect.

In 2005, Mary died.

### C. *Litigation and Resulting Law of the Case Regarding the Trust Document's No Contest Provisions*

The trust document contains a no contest clause. The contested amendment also includes a no contest clause, phrased slightly more broadly than that in the trust document. For several years beginning in 2008, Trustees and Beneficiaries litigated issues involving the no contest clauses and the effect of the contested amendment.

#### 1. *Beneficiaries' 2010 petition for surcharge and to account*

Primarily, Trustees and Beneficiaries litigated whether Beneficiaries would trigger either no contest clause by filing a petition seeking an order for surcharges and to account based on Trustees' alleged failure to distribute the assets in Trusts B and C upon Mary's death (the 2010 petition). (See generally *Donkin II, supra*, B266036, at pp. 6-8.) Beneficiaries based the 2010 petition on their reading of the trust document provisions governing the distribution of decedent's Trusts B and C, and their view that Mary lacked authority to alter these terms through the contested amendment, because Mary executed it after Trusts B and C had become irrevocable. (See *Donkin I, supra,* 58 Cal.4th at pp. 435–436.)

## 2. *California Supreme Court decision (Donkin I)*

Changes in the Probate Code sections regarding no contest clauses[6] further complicated this dispute, resulting in a 2013 California Supreme Court decision. (See *Donkin I*, *supra*, 58 Cal.4th 412.) In the portions of that decision relevant to our current analysis, the Court held that, under either the new or the old law regarding the enforceability of no contest provisions, "the no contest clauses in the [trust document] are unenforceable against" the 2010 petition "challenging the conduct of the successor trustees under the asserted authority of the [contested] [a]mendment" (*id.* at pp. 415–416), because the 2010 petition does not constitute a "contest" as defined in section 21311, subdivision (a). (*Donkin I*, *supra*, 58 Cal.4th at p. 432; see § 21311, subd. (a) [itemizing the "types of contests" against which a no contest clause may be enforced].) Rather, the Court explained, the 2010 petition sought an interpretation regarding the effect of the contested amendment on the trust document, and requested distribution in accordance with Beneficiaries' preferred interpretation, neither of which violates a no-contest clause. (*Donkin I*, *supra*, at pp. 432–433 & 435-436.)

---

[6] "On January 1, 2010, changes to the Probate Code eliminated the safe harbor provisions of section 21320, pursuant to which a party could obtain a declaration from the court prior to instituting an action that the proposed action would not violate the no contest clause of the instrument at issue." (*Donkin II, supra*, B266036, at p. 6.)

### 3. *Trustees' 2014 petition for instructions*

In further trial court proceedings on remand from the Supreme Court, Trustees filed a petition for instructions with the trial court (the 2014 petition). The 2014 petition raised two issues, only one of which is relevant to the current appeal. Namely, it sought instructions regarding "the proper interpretation of the allocation paragraph in the Trust as amended by the [contested] [a]mendment." (*Donkin II, supra*, B266036, at p. 10.) This request tracked the Supreme Court's comment that "[i]t is up to the court or arbitrator to rule on the merits of the parties' conflicting interpretation of the trust instrument in the future, if the beneficiaries choose to pursue their claims [in the 2010 petition]." (*Donkin I, supra,* 58 Cal.4th at p. 438.) The 2014 petition effectively asked the trial court to issue such a ruling.

### 4. *The 2017 decision of this court (Donkin II)*

The trial court's initial decisions regarding the 2014 petition and 2010 petition resulted in another appeal to this court. We reversed in part, because the trial court had refused to hear the 2014 petition, based on its incorrect conclusion that the petition presented only issues already decided by the Supreme Court in *Donkin I.* (*Donkin II, supra*, B266036, at p. 22.) We remanded for the trial court to hear and decide the 2014 petition. (*Id.* at p. 30.) It is the trial court's decision following such remand that is currently before us for review.

9

### D.    *Trial Court's June 2018 Order*

In minute orders dated October 27, 2017 and January 17, 2018, the court provided a detailed and thoughtful discussion of the September 2014 petition and, relatedly, certain issues involved in the 2010 petition.

Specifically, the trial court concluded that, following the death of Rodney, Sr., in 2002, the decedent's Trust B became irrevocable, meaning that Mary lacked authority after that point to "alter the terms of the Trust as they pertain to Trust B." As such, Trusts B and C were to be distributed on the terms set forth in the trust document, not the contested amendment.

The court further concluded that the trust document provisions, when read together, required the "Trustees . . . to have distributed to Beneficiaries their share of what Trustees should have allocated to Trust B upon Mary passing." In reaching this conclusion, the court rejected Trustees' arguments that trust document provisions granting the Trustees discretion with respect to "Support and Education" and "Extraordinary Distribution" rendered the entire trust a "continuing conditional discretionary, spendthrift trust that did not require the assets to be distributed immediately upon Mary's death."  (Underlining omitted.)  "That Trustees have certain discretionary powers and have general powers do not in and of themselves give them discretion to disregard specific provisions of the Trust.  Discretion does not include just doing whatever Trustees wanted."

The court based its analysis on its interpretation of the trust's allocation, distribution and revocability provisions, considering them in the context of the larger trust document. The court rejected Trustees' argument that it should consider

10

extrinsic evidence of Mary's intent in executing the contested amendment, explaining that, given the inability of the contested amendment to govern Trusts B and C, the only intent potentially relevant to interpreting provisions governing Trusts B and C was the intent of Mary and/or Rodney, Sr., in drafting *the trust document*.

Having determined that the trust obligated the Trustees to allocate and distribute the assets in Trusts B and C to Beneficiaries upon Mary's death, the court continued the 2010 petition for surcharge "for further hearing to determine whether Trustees are liable or not, and if so, in what amount, for the alleged surcharge in view of the [court's] decision . . . and in connection with accountings for the relevant time periods." Such continuance was necessary, the court explained, because it needed to determine what "amounts or assets . . . should have been distributed on Rodney's death and what was not," and, in turn, "what should have been distributed when Mary died."

Finally, the court rejected Trustees' argument that the 2010 petition is barred by the statute of limitations set forth in section 16061.8. The court explained that this section applies only to "contests," and that the California Supreme Court had already concluded that respondents' 2010 petition did not constitute a "contest." (*Donkin I, supra*, 58 Cal.4th at p. 432.)

The court issued a June 25, 2018 order, which incorporated by reference its October 2017 and January 2018 orders and the reasoning provided therein. Trustees timely appealed.

11

## DISCUSSION

### A. *Trustees' Arguments and Standard of Review*

We can discern two primary arguments from Trustees' briefing on appeal.  First, Trustees contend the trial court erred in concluding that the statute of limitations for "action[s] contest[ing] [a] trust" was inapplicable to Beneficiaries' claims.  (§ 16061.8.)  According to Trustees, because Beneficiaries seek distribution of Trusts B and C in a manner inconsistent with Mary's contested amendment, Beneficiaries are "contest[ing]" a trust document (the contested amendment), regardless of whether the contested amendment actually amended the terms governing distribution of Trusts B and C or not.

Second, Trustees argue that, even if the contested amendment did not amend the terms of the trust document regarding Trusts B and C, Trustees were not required to distribute the assets in these trusts upon Mary's death, and may instead continue to manage them as part of a continuing discretionary spendthrift trust.  They argue the trial court erred in rejecting this interpretation of the trust document and permitting Beneficiaries to proceed with their 2010 petition.

These arguments challenge the trial court's interpretation of the Probate Code and the trust document.  We review both types of questions de novo.[7]  (*Brown v. Labow* (2007)

---

[7] As a general rule, orders "[c]ompelling the trustee to submit an account or report acts as trustee" are not appealable.  (§ 1304, subd. (a)(1).)  There is an exception to this rule, however, where, as here, the order requiring a trustee to account "expressly or implicitly decides other issues that could be the subject of an appealable probate order," such

157 Cal.App.4th 795, 812 ["[t]he interpretation of a trust instrument, like any written document, is a question of law"]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [meaning and construction of statutes reviewed de novo].)

Based on our independent review of the applicable law and the trust document, we conclude that none of Trustees' arguments has merit, and find no error in the trial court's order.

### B. *The Trial Court Correctly Interpreted the Trust Document and Correctly Rejected Trustees' Statute of Limitations Argument*

#### 1. *The trial court correctly concluded that the contested amendment had no effect on Trusts B and C*

A threshold issue in the court's decision below is whether, after Rodney, Sr.'s death, Mary had authority to amend the terms of the trust document regarding Trusts B and C, and whether, as a result, the contested amendment governs the distribution of the assets in these trusts.

Although it is not entirely clear from their briefing, Trustees do not appear to be challenging the trial court's ruling in this regard. Instead, Trustees seem to want to ignore the issue by arguing that, "whether Mary did or did not have the right to

---

as the interpretation of a trust. (*Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 522.) The remainder of the trial court's decision addressing appellants' petition for instructions likewise "[d]etermine[s] questions of construction of a trust instrument" and is also appealable. (See §§ 17200, subd. (b)(1), 1304, subd. (a).)

amend the entire Trust is irrelevant.  The fact remains that Mary did amend the Trust."

It is axiomatic, however, that an amendment Mary had no legal authority to execute can have no legal effect.  We agree with the trial court that, following Rodney, Sr.'s death, Mary lacked the authority to alter the terms of the trust document governing Trusts B and C.  The plain language of the trust document provides Trusts B and C became "irrevocable" at that point, meaning Mary "was not at liberty to change that planned distribution after [Rodney, Sr.'s] death." (*Aguilar v. Aguilar* (2008) 168 Cal.App.4th 35, 40; see *Heaps v. Heaps* (2004) 124 Cal.App.4th 286, 291–292 [attempts to transfer assets from irrevocable trust to different trusts constituted conversion]; see also § 15403, subd. (a) [requiring consent of beneficiaries to amend terms of irrevocable trust].)

That Trusts B and C became irrevocable and were not subject to amendment following Rodney, Sr.'s death is also consistent with the "Donkins' clear intent to establish an estate plan that minimizes estate taxes."[8] (*Donkin I, supra*, 58 Cal.4th at p. 418, fn. 3.)  " 'To avoid federal estate tax inclusion in the surviving spouse's estate, the bypass trust [here, Trust B,] must be irrevocable and *unamendable* on and after the first spouse's death.' " (*Id*. at pp. 416–417, quoting 2 Drafting Cal. Revocable Trusts (Cont.Ed.Bar 4th ed. 2003), Revocation and Amendment, § 20.6, p. 20–14 (rev. 9/13).)  Thus, Mary's inability to amend

_____

[8] In other contexts, the trust document also clarifies this desire to reap the benefits of the federal marital deduction through the creation of Trusts B and C is paramount and should trump other provisions.

14

terms governing Trust B (and, by extension, Trust C) after Rodney, Sr.'s death is necessary in order to secure the benefit of the federal marital deduction.  (See *Donkin I, supra,* 58 Cal.4th at pp. 416–417; *McIndoe v. Olivos* (2005) 132 Cal.App.4th 483, 489 [surviving spouse could not amend trust terms regarding exempt trust because this would give her "power over the assets in the exempt trust, a result the trustors clearly did not intend, as evidenced by their use of a marital deduction and exempt trust"].)

Thus, the trial court correctly concluded that Trusts B and C should be distributed according to the original terms of the trust document, not the terms of the contested amendment. This key conclusion guides our analysis of Trustees' arguments, which we discuss below.

> **2.** **The trial court correctly determined the Beneficiaries' claims in the 2010 petition are not a "contest" and thus are not time-barred**

Section 16061.8 imposes time limitations on when an individual "may bring an action to contest [a] trust."  (§ 16061.8.) Trustees argue that, because the Beneficiaries filed their 2010 petition after the deadline imposed by section 16061.8, the petition is time-barred.  We disagree.

As discussed above, the trust document, not the contested amendment, governs Trusts B and C.  The 2010 petition requesting distribution of Trusts B and C in accordance with the terms of the trust document, rather than the contested amendment, is thus not an action *contesting* a trust, but an action requesting timely *execution* of a trust's provisions. To the extent the 2010 petition seeks to enforce a particular

15

interpretation of these provisions, "[s]uch calls for interpretation [also] do not violate no contest clauses." (See *Donkin I, supra*, 58 Cal.4th at pp. 433–434 ["beneficiaries' claims, although sometimes couched in terms suggesting they are arguing the validity of the [contested amendment], at bottom seek an interpretation of the Family Trust instrument, rather than to void any portion of it or to set aside its distributive plan"] (italics omitted).)

Moreover, " '[w]hether there has been a "contest" within the meaning of a particular no-contest clause depends upon the circumstances of the particular case and the language used.' " (*Burch v. George* (1994) 7 Cal.4th 246, 254–255 (*Burch*); see § 21310, subd. (a) [defining "contest" as "a pleading filed with the court by a beneficiary that would result in a penalty under a no contest clause, if the no contest clause is enforced"].) The California Supreme Court held in *Donkin I* that Beneficiaries' 2010 petition did *not* trigger the no contest clauses in either the trust document or contested amendment.[9] Thus, the 2010 petition "is not a contest of the [trust document] as defined by the trust's language, and . . . section 16061.8 does not apply."[10] (*Yeh v. Tai* (2017) 18 Cal.App.5th 953, 967.)

_____

[9] While some of Trustees' arguments are directed at Beneficiaries 2017 trial brief, their arguments involve the same claims on which the 2010 petition is based, and likewise constitute requests for execution and/or interpretation.

[10] Trustees briefly argue that, through the contested amendment and its no contest clause, Mary "require[d] a beneficiary to accept the Trust's terms, *as amended*" (boldface omitted and italics added), such that, when Beneficiaries called into question Mary's authority to amend all aspects of the trust

16

Trustees' only argument as to why the Supreme Court's decision in *Donkin I* is not dispositive of Trustees' statute of limitations argument is that the Supreme Court "believed that . . . Beneficiaries were seeking an interpretation of the instrument's terms through an understanding of what they view as Mary's probable intent," and, therefore, the case stands only for the proposition that *a request to ascertain Mary's intent* is not a "contest." We disagree. Trustees identify no specific language in *Donkin I* to support their characterization of the Supreme Court's decision in this way. Nor can we find any language in the Court's opinion that supports this characterization. To the contrary, although *Trustees*' arguments to the Supreme Court focused on Mary's intent, the Supreme Court's reasoning looked both at Mary's intent and her authority with respect to Trusts B and C following Rodney, Sr.'s death. (See, e.g., *Donkin I, supra*, 58 Cal.4th at pp. 435–436.)[11]

---

through the contested amendment, they contested the trust. This argument merely assumes the validity of the contested amendment as applied to Trusts B and C. If the contested amendment never became part of the trust document's terms governing Trusts B and C, challenging the contested amendment in this respect does not contest the trust document.

[11] "The successor trustees' argument, however, is premised on a description of the nature of the beneficiaries' claim that is not accurate. As we understand the beneficiaries' argument, the *beneficiaries are not challenging the actions of Mary in executing the Trust's Second Amendment per se*, nor do they argue that the Trust's Second Amendment is void. Rather, the beneficiaries argue in favor of an interpretation of the Family Trust instrument, including the Trust's Second Amendment, different from the one urged by the successor trustees. The

17

The trial court correctly concluded that the Beneficiaries' claims, and the 2010 petition specifically, were not subject to section 16061.8's time limitations on "action[s] . . . contest[ing] [a] trust." (§ 16061.8.)

### 3. *The trust document required distribution of Trusts B and C as soon as is practicable after Mary's death*

Trustees argue that, even if the contested amendment did not alter the terms applicable to Trusts B and C, the trust document creates a "continuing conditional discretionary spendthrift Trust that did not terminate and did not require immediate distribution upon Mary's death." (Boldface omitted.) Trustees point to various provisions throughout the trust document that create trustee discretion to manage certain types of distributions at certain times. Consistent with basic canons of trust interpretation, we do not read these provisions

beneficiaries' contentions seek to establish the meaning of the instrument's terms through an understanding of what they view as Mary's probable intent. *They argue that because Mary possessed only limited authority after the death of Rodney to alter the provisions of the Family Trust and could not validly amend the trust with respect to his Decedent's Marital Share, the new paragraph substituted by the Trust's Second Amendment regarding the allocation of trust assets after Mary's death* must have been intended by her to govern, *and should be interpreted to govern,* only the assets of Survivor's Trust A. Consistent with this interpretation, the beneficiaries argue that the trust's distribution paragraph, left unaltered by the Trust's Second Amendment, required the assets of the Decedent's Trusts B and C to be distributed 'outright as soon as is practicable' after the death of Mary." (*Donkin I, supra*, 58 Cal.4th at pp. 435–436.)

18

as permitting Trustees discretion to manage Trusts B and C indefinitely.

In interpreting a trust, courts seek to ascertain the trustor's intent, which requires that "we look first to the terms of [the] trust." (*Burch, supra*, 7 Cal.4th at pp. 256, 258.) "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained." (§ 21122.) Furthermore, "[t]he words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative." (§ 21120.)

Here, the only way to give effect to all terms of the trust document regarding Trusts B and C is to interpret the provisions Trustees cite as granting Trustees discretion for a brief period following Mary's death, during which the Trustees may need to handle various tasks in preparation for final distribution.

Namely, in the section "Allocation and Distribution of Trust Assets" (all capitalization omitted), the trust document first requires that "[u]pon the death of the Surviving Spouse, the Trustee shall hold, administer and distribute the Trust in the following manner." The sections that immediately follow set forth various tasks that may be necessary prior to the distribution of the trust assets, such as disposing of Rodney, Sr.'s, and Mary's personal property as required in a separate memorandum, should one exist, deducting the amount of any loans or gifts from a beneficiary's share, and establishing, if necessary, a special needs trust for any incompetent beneficiaries. Among these sections are also the provisions on which Trustees rely, which create trustee discretion to distribute

19

funds for the support and education of the beneficiaries, or otherwise as "necessary or advisable" for their benefit, "prior to the division of the trust into shares as hereinbefore provided, or prior to distribution if divided." The trust document then identifies when such division and distribution of assets should occur: "When the above conditions are satisfied, the debts and obligations of the Trust Estate have been paid, and any special bequests have been distributed, the Trustee shall allocate and divide this Trust Estate as then constituted" and "[a]fter allocating and dividing the residual of the Trust Estate into shares, *the Trustee shall distribute the shares allocated to Primary Beneficiaries outright as soon as is practicable*." (Italics added.)

The provisions addressing distribution thus speak in mandatory terms and plainly do not contemplate Trustees retaining control over Trusts B and C after Mary's passing for any longer than is necessary to address any applicable administrative tasks the trust documents designate as conditions precedent to division and distribution. This reading of the trust document uses the ordinary meaning to the phrase "as soon as is practicable," while also giving effect to all provisions discussing the Trustees' discretion following Mary's death. The interpretation Trustees urge, by contrast, would render meaningless the requirement that distribution take place "as soon as is practicable" and be "outright" to the Beneficiaries.

Although "extrinsic evidence is admissible to ascertain the meaning of the trust and the intent of the trustor" (*Safai v. Safai* (2008) 164 Cal.App.4th 233, 244, citing *Burch, supra*, 7 Cal.4th at pp. 256, 258), the only extrinsic evidence relating to intent of either Trustor in drafting the trust document is an estate

20

planning book that shows, if anything, that a primary goal of the trust document was minimizing estate taxes through use of the marital deduction. That does not speak to Trustees' characterization of Trusts B and C as continuous conditional spendthrift trusts. Further, extrinsic evidence regarding Mary's intent in executing the contested amendment, if it speaks at all to intent of the *original* trust document, does so in a manner that is also inconsistent with Trustees' arguments. This is because, in the contested amendment, Mary attempted to change the terms of the trust document so that the Trustees would retain discretion to administer all estate assets for an indefinite period following Mary's death. Had she understood the original terms of the trust document as already accomplishing this, such amendment would not have been necessary.

In sum, the trial court correctly interpreted the terms of the trust documents as requiring distribution of Trusts B and C to Beneficiaries "as soon as is practicable" after Mary's death, as the Beneficiaries argued below. The trust document does not permit the Trustees to continue to administer Trusts B and C as spendthrift trusts for any longer after Mary's death than is necessary to address the special scenarios discussed above (none of which Trustees argue applies), calculate the Beneficiaries' various shares, and prepare the trust assets for distribution to the Beneficiaries.[12]

---

[12] Appellants' petition raises other arguments regarding issues not decided in the order on appeal and already finally determined by the Supreme Court's 2013 decision (for example, whether beneficiaries should be disinherited under the no contest clause, or whether the old version of the Probate Code section

21

## C.    *Unauthorized Practice of Law*

Trustees represent themselves.  Beneficiaries argue that such self-representation constitutes an unauthorized practice of law.[13]  We disagree.

In *Ziegler v. Nickel* (1998) 64 Cal.App.4th 545 (*Ziegler*), Division Three of this court concluded that "[a] non-attorney trustee who represents [a] trust in court is representing and affecting the interests of the beneficiary and is thus engaged in the unauthorized practice of law.  [Citation.]" (*Id.* at p. 549.) *Ziegler* did not involve probate proceedings, but rather a lawsuit between a mobilehome park and a trust—appearing, as a trust necessarily does, through its trustee.  (See *Powers v. Ashton* (1975) 45 Cal.App.3d 783, 787 [a trust can only be a party to litigation through a trustee].)  In concluding the trustee could not represent himself in prosecuting the trust's lawsuit against the mobilehome park, *Ziegler* explained that " ' a trustee's duties in connection with his or her office do not include the right to present argument [while representing himself] in courts of the state, because in this capacity such trustee would be

_____

governing no contest clauses should apply).  We need not and do not address these arguments.

[13] In the section of their brief on "unauthorized practice of law" (capitalization omitted), Beneficiaries also argue that, because Trustees' petition seeks an interpretation of the trust that would benefit Rodney, Jr., and Vicki personally, there exists a conflict of interest and Trustees are violating their fiduciary duties to the trust.  The trial court's order expressly states, however, that it "is not now ruling on whether Trustees breached their fiduciary duties at different times."  This issue is thus not properly before us on appeal.

22

representing interests of others and would therefore be engaged in the unauthorized practice of law. [Citations.]' [Citations.] [¶] Stated otherwise, '[a] trustee must always act solely in the beneficiaries' interest. [Citations.]' [Citations.] The actions of the trustee affect the trust estate and therefore affect the interest of the beneficiaries. A non-attorney trustee who represents the trust in court is representing and affecting the interests of the beneficiary and is thus engaged in the unauthorized practice of law." (*Ziegler, supra*, 64 Cal.App.4th at pp. 548–549, italics omitted.)

*Ziegler's* rationale is that the trustee was effectively speaking for the interests of the trust beneficiaries in the lawsuit against the mobilehome park and, as a nonlawyer, improperly representing those beneficiaries. (*Ziegler, supra*, 64 Cal.App.4th at pp. 548–549; cf. *Aulisio v. Bancroft* (2014) 230 Cal.App.4th 1516, 1519–1520 [a self-represented trustee does not engage in the unauthorized practice of law under *Ziegler* when he is also the sole beneficiary, and thus is not representing the interests of another].)

This reasoning is closely connected with the specific facts in *Ziegler*. Namely, in non-probate litigation between a trustee and a third party (as in *Ziegler)*, the trustee is acting as a fiduciary for the benefit of the beneficiaries.[14] But the same

_____

[14] Other cases involving conservatorship, including one on which Beneficiaries rely for their unauthorized practice argument, have made a similar distinction between probate litigation and litigation outside the probate context between a trust or estate and a third party. (*Hansen v. Hansen* (2003) 114 Cal.App.4th 618, 619 ["a conservator, executor, or personal representative of a decedent's estate who is unlicensed to practice

23

cannot be said when, as here, a trustee is seeking instructions regarding how to interpret the trust document or execute his or her duties thereunder. A trustee seeks such instructions in order to effectuate the intent of the trustor, not to represent the interests of the beneficiaries. (See *Union Bank & Trust Co. v. McColgan* (1948) 84 Cal.App.2d 208, 213 (*Union Bank*) [trustee's broader duty is to "to carry out the terms of the trust according to the expressed intent of the trustor"].) Indeed, as is the case here, the beneficiaries may disagree with the trustee regarding the trust interpretation the court should adopt, and/or what the trustee's duties are. Under these circumstances, the trustee is adverse to the beneficiaries and thus is not representing the beneficiaries' interests. The same is true when a trustee disagrees with the need for an accounting or surcharge based on the trustee's and beneficiaries' varying understandings of the trust document.

The decision of Division Six in *Finkbeiner v. Gavid* (2006) 136 Cal.App.4th 1417 (*Finkbeiner*) is instructive here. *Finkbeiner* concluded that, in probate litigation between a trustee and beneficiaries, the trustee was not engaging in the unauthorized practice of law by representing herself when filing a petition to modify and terminate the trust. (*Id.* at p. 1421.) The court distinguished *Ziegler* on the basis that the trustee in

---

law cannot represent himself when acting on behalf of the estate in matters outside the probate proceedings"]; *City of Downey v. Johnson* (1968) 263 Cal.App.2d 775, 778 [nonlawyer conservator and executor could not represent estate in the defense of a condemnation action that "is not an integral part of the proceedings within the jurisdiction of the probate court"].)

24

*Finkbeiner* "[was] not suing a third party. She filed the petition as part of her fiduciary responsibility to the court. [The trustee] correctly note[d] that trustees have various statutory duties. She was appointed by the court for the purpose of selling the property. She had a duty to account for trust assets, a right to seek her fees and a responsibility to notify the court if she felt maintaining an ineffective trust was wasteful to the trust estate. By filing her petition to modify and terminate the trust, she was simply fulfilling her duties as trustee. (See Prob. Code, § 17200 et seq.) She was not engaged in the unauthorized practice of law." (*Finkbeiner, supra*, 136 Cal.App.4th at p. 1421.)

Like the court in *Finkbeiner*, we conclude that the reasoning in *Ziegler* does not apply to the matter before us. As in *Finkbeiner*, the instant matter is between trustees and trust beneficiaries in the context of probate proceedings, not between trustees and a third party in non-probate litigation. Of course, unlike in *Finkbeiner*, neither statute nor fiduciary duty required Trustees to file the petition for instructions at issue or to oppose Beneficiaries' petition for surcharge and to account. Nevertheless, like a trustee filing a petition pursuant to a statutory mandate, Trustees here are seeking judicial clarification on how to interpret a trust document and not acting on behalf of the beneficiaries. Rather, Trustees and Beneficiaries are litigating a dispute about what precisely the trust requires. Therefore, as in *Finkbeiner*, Trustees may represent themselves in this dispute without engaging in the unauthorized practice of law.

We note, however, that Trustees have wasted both the court's and Beneficiaries' resources and time trying to relitigate issues already decided by the California Supreme Court in this

25

case.  We are cognizant of the possibility that, had Trustees been represented by an attorney, this may not have occurred.  But this is a potential hazard of any self-representation, and cannot alone justify adopting a broader rule that all trustees seeking clarification regarding what a trust requires of them must take on the expense of hiring counsel.[15]  Whether Trustees must be represented by counsel in future proceedings will depend on the nature of the Trustees' efforts in those proceedings, considered in light of our decision and the case law discussed above.

---

[15] Moreover, absent the need to protect the interests of the beneficiaries as in *Ziegler*, requiring counsel for a trustee filing a petition for instructions in litigation with the trust beneficiaries could place an unjustified burden on small trust estates.

## DISPOSITION

The trial court's order is affirmed.  Respondents are awarded their costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WHITE, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27